# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2024-CP-01427-COA

**C.D.M.**                                                                                          **APPELLANT**

**v.**

**LEE COUNTY DEPARTMENT OF CHILD**                                         **APPELLEES**
**PROTECTION SERVICES, BY ANDREA A.**
**SANDERS, S.A.M., S.C.M., S.M. AND D.M.,**
**MINORS AND MISSISSIPPI DEPARTMENT OF**
**CHILD PROTECTION SERVICES**

| | |
|---|---|
| DATE OF JUDGMENT: | 11/25/2024 |
| TRIAL JUDGE: | HON. STACI SHUMPERT BEVILL |
| COURT FROM WHICH APPEALED: | LEE COUNTY YOUTH COURT |
| ATTORNEY FOR APPELLANT: | C.D.M. (PRO SE) |
| ATTORNEYS FOR APPELLEES: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: CALLAGHAN BASIL MASON |
| | LINDSEY ETHERIDGE LAZINSKY |
| NATURE OF THE CASE: | CIVIL - OTHER |
| DISPOSITION: | AFFIRMED - 07/28/2026 |
| MOTION FOR REHEARING FILED: | |

**BEFORE WILSON, P.J., McDONALD AND McCARTY, JJ.**

**WILSON, P.J., FOR THE COURT:**

¶1.     Callie M. appeals from a judgment of the Lee County Youth Court terminating her parental rights.[1]  The youth court's decision was based on a lengthy history of Callie neglecting and failing to care for the children and failing to comply with service plans for reunification.  Finding no error, we affirm.

## FACTS AND PROCEDURAL HISTORY

---

[1] We use abbreviated names and initials to protect the minors' privacy.

¶2.     Callie M. and William M. are the biological parents of five children: B.M., a male child born in 2010; S.C. and S.A., female twins born in 2015; S.M., a female child born in 2017; and D.M., a male child born in 2020.

¶3.     In September 2021, the Mississippi Department of Child Protection Services (CPS) received a report that B.M., S.C., and S.A. had come to school dirty with several untreated open wounds, bruises, and burns.  CPS assessed the children and the home and found the home unsafe and unsanitary.  Trash, cockroaches, and dirty cat litter were found throughout the home, the refrigerator and freezer were chained and padlocked, blankets and pillows were piled in D.M.'s crib, and cats were climbing in and out of the crib.  That same day, the Lee County Youth Court removed the children from Callie and William's home and placed them in CPS custody.  The children were placed in licensed foster homes.[2]

¶4.     Callie and William signed a family service plan with the goal of reunification.  The plan required Callie and William to maintain contact with the children through visitation, clean their home, replace deadbolts, locks, and chains throughout the home with suitable child-proof mechanisms, and maintain communication with the caseworker.

¶5.     The youth court held adjudication and disposition hearings in November 2021. At the disposition hearing, CPS reported that all the children were underweight or malnourished, S.C. and S.A. had severe staph infections, D.M. was not meeting growth milestones for his

---

[2] The children were placed in different foster homes.  B.M. was placed with one family, S.A. and S.C. with a second family, and S.M. and D.M. with a third family.

age and needed early intervention assistance, and B.M.'s and S.M.'s foster parents had reported that the children were concealing and trying to save food. CPS also reported that B.M. had displayed concerning behavior and informed CPS that he had kissed his sisters, that a girl his age had touched his penis, that this event had been photographed on William's phone, and that William was aware of the photographs.

¶6. CPS also reported that Callie and William were cooperating with the agency and making repairs to the home, but CPS maintained its concerns that the home was unsanitary and endangered the children's health. CPS noted that there were twelve cats in the house and dirty litter boxes throughout. The youth court adjudicated the children to be neglected and found that reunification with Callie and William was in the children's best interests. The court adopted a permanency plan requiring CPS to make reasonable efforts toward reunification, and the children remained with their foster families. The youth court also ordered CPS to set up supervised visitation with the parents and children, and B.M., S.A., and S.C. began psychiatric therapy.

¶7. In March 2022, the youth court held a permanency review hearing. At the hearing, CPS reported that Callie and William had made improvements to the home, but CPS was still concerned that the home was unsafe and unsanitary because of the presence of numerous cats and the dirty litter boxes. CPS reported that Callie and William's behaviors had harmed the children mentally and emotionally, and CPS had concerns that Callie and William "may have

3

known of some inappropriate behaviors and turned a blind eye."[3]  While Callie and William

had completed parenting classes, CPS remained concerned that they were unable to properly

care for the children.  CPS concluded that it was not safe for the children to be returned to

the home.  The youth court ordered that the permanency plan of reunification remain in place

and directed that supervised visitation with the parents continue.

¶8.     The youth court held another permanency review hearing in June 2022.  S.C. and

S.A.'s foster parents reported that they were concerned about how the girls reverted to

concerning behaviors following visitation with Callie and William.  They also reported that

the girls had disclosed prior instances of sexual abuse by B.M., which Callie and William

allegedly knew about.  The youth court ordered that supervised visitation continue.

---

[3] At the final hearing in this case, CPS worker Chiquita Westmoreland testified about several instances when she felt the parents had "turned a blind eye" to "inappropriate sexual behavior" in the home.  In one instance, B.M. had reported that a girl his age had touched him inappropriately, that this event had been photographed on William's phone, and that William was aware of the photographs.  William told Westmoreland that he "was dealing with it" but did not provide any further information, and Callie did not provide any information to CPS regarding this incident. Westmoreland believed that William's response "definitely wasn't a good answer."

Westmoreland also testified that Callie had previously informed CPS that she believed B.M. had been sexually abused by an adult man the family had previously shared a home with.  Westmoreland testified that Callie and William were not able to provide details about the abuse or how they addressed the concern.  Westmoreland testified that the suspected perpetrator was later convicted of molesting his own child.  Westmoreland also testified that B.M. disclosed that he had witnessed his parents having sex and that he subsequently acted that out on his siblings.  In response, Callie had B.M. sleep on the couch while his sisters slept in another room.

CPS reports prior to September 2021 also documented several disclosures by B.M., S.C., and S.M. of allegations of inappropriate sexual behavior by B.M.

¶9.     At a permanency review hearing in October 2022, the youth court ordered that the plan remain reunification and granted unsupervised day visitation outside the home.  Two weeks later, S.A. was placed in acute care at the hospital following a behavioral outburst that CPS and her foster parents believed was related to an unauthorized and unsupervised visit to her parents' home.  On October 28, the guardian ad litem (GAL), Bethany Clark, filed a motion requesting a temporary suspension of S.A.'s visitation pending further investigation by the GAL and a recommendation from S.A.'s therapist.  The youth court granted the GAL's motion.  Callie and William continued visitation with S.C., S.M., and D.M. outside the home, and two weeks later S.A. resumed unsupervised visitation outside the home.

¶10.     At the next permanency hearing in January 2023, the youth court ordered that unsupervised day visits could occur in the home on the weekend.  GAL Clark later testified that she had recommended allowing unsupervised day visits because the next scheduled hearing date was in April, and the unsupervised visitation would allow Callie and William to demonstrate progress in their parenting abilities.

¶11.     In February 2023, the youth court held a status review hearing.  GAL Clark was on maternity leave and was not present at the hearing.  In addition, S.A., S.C., S.M., D.M., and their foster parents were not present at the hearing, and GAL Clark later discovered that the foster parents were not given notice of the hearing.  At the hearing, the youth court placed S.C., S.A., S.M., and D.M. in Callie and William's care for a 90-day trial home placement.  The court also ordered that the twins' therapy services should continue uninterrupted during

the placement. The youth court's order stated, "[B.M.] is on restriction and not able to visit at this time," and the "GAL is to be contacted when [B.M.] is able to visit."

¶12. At the next hearing in April 2023, CPS reported that Callie and William's home was again unclean and unsanitary, that Callie and William had asked the children's former foster parents for money to buy groceries and pay their electricity bill, and that Callie and William had asked the children's former foster parents to watch the children on weekends during the trial home placement. Further, Callie and William had failed to comply with the court's order to continue the twins' therapy services, and S.A. was reportedly struggling to adjust to her return home. The youth court continued the trial home placement but ordered CPS to visit the home every three days. The court also ordered therapy services for the twins to resume immediately. Finally, the court ordered Callie and William to attempt to qualify for Supplemental Nutritional Assistance Program (SNAP) and other welfare assistance.

¶13. At the next permanency review hearing in May 2023, CPS reported that Callie and William continued to struggle financially and had relied on CPS to assist with groceries and their electricity bill. At one point, power to the home was cutoff while the children were living there. CPS reported that therapy services for the twins still had not resumed and that S.A. continued to struggle to adjust to Callie and William's home. The court continued the trial home placement and placed S.C., S.M., and D.M. in Callie and William's custody. Defense counsel argued that returning the children to Callie and William's custody would help financially by allowing Callie and William to receive Social Security disability benefits

6

due to S.C. The court ordered the parents to cooperate with CPS to seek to qualify for SNAP benefits and other welfare assistance and to receive S.C.'s disability benefits. The court also ordered Callie and William to have the children's eyeglasses repaired or replaced immediately. (The children had broken or lost their glasses and had not worn them during the trial home placement, which had caused the children's serious eye problems to worsen.)

¶14. The next hearing was on June 6, 2023. The children's former foster parents reported that S.A., S.C., S.M., and D.M. had all spent the Memorial Day weekend with the twins' former foster parents. The twins' former foster parents picked up the children in Tupelo on Friday and ate dinner with Callie, the children, and B.M.[4] The children were covered in bug bites, filthy, smelled of urine and feces, had days-old urine and feces stains in their underwear, and one child complained that it hurt to urinate. Again, none of the children were wearing eyeglasses. The foster parents were also concerned that B.M. had displayed inappropriate affectionate behavior toward his sisters at dinner. The foster parents reported that they corrected the behavior several times, but Callie never addressed the behavior. CPS reported that Callie had failed to complete the process to receive S.C.'s disability benefits, but William had set up therapy and in-home services. The youth court continued the trial home placement. The court also directed GAL Clark to investigate why the family had not yet received S.C.'s disability benefits and review the general condition of the children and

---

[4] At that time, the youth court's prior order that B.M. not have contact with the children remained in effect.

the status of the trial home placement.

¶15. On June 30, 2023, Clark filed a report recommending that the trial home placement should end and that the children should be removed from Callie and William's home. Clark reported that on June 23, 2023, she visited the children's daycare unannounced and found bug bites, scratches, and sores on the children, along with child bite marks. While Callie claimed that the children's underwear had urine and feces stains because their daycare ran out of toilet paper, Clark found that Callie's claim was false. Clark also reported that the children were, again, not wearing their eyeglasses and that Callie had violated the court's order by failing to continue the twins' therapy services.[5] CPS reported that the family home had not substantially improved since CPS implemented in-home services, and most progress and effort came from William, not Callie. Clark also reported that Callie had failed to provide proof of income to the Social Security Administration in order to receive S.C.'s benefits, despite having been informed of that requirement in early May.

¶16. Also on June 30, 2023, S.C., S.A., S.M., and D.M. visited the twins' former foster parents for the July 4 holiday weekend while Callie and William "bug bombed" their home.[6] On July 3, S.A. was admitted to acute care following a behavioral outburst at the foster parents' home when she was attempting to harm herself and was scaring the other children.

_____

[5] During the trial home placement, S.C. attended only one intake appointment with a therapy service. Other than her hospitalization in DeSoto County in July, S.A. did not receive any therapy services during the placement.

[6] CPS directed the parents to attempt to exterminate the many bugs in the home, and CPS purchased the bug bombs due to the financial inability of the parents.

CPS stayed with S.A. for several hours while she was in the hospital; however, Callie and William did not visit S.A. S.A. was discharged on July 5 and returned to Callie and William's home. Clark and CPS visited the home on July 5. The house was cluttered and dirty, trash and food were scattered throughout the living areas of the house, and bugs were crawling in the sink and on the kitchen cabinets and counters. On July 6, 2023, CPS requested emergency custody of the children, and the court terminated the trial home placement and placed the children in foster homes. The court granted Callie and William unsupervised visitation outside their home.

¶17. In September 2023, CPS reported that even after the trial home placement ended, Callie and William's home continued to be infested with bugs, and they continued to fail to demonstrate parental capacity. CPS also reported that B.M. continued to visit with his siblings in violation of the court's order, and he had allegedly exposed himself to S.M. and told her to "suck" his genitals in the presence of his other siblings. The youth court again adjudicated the children as neglected and held a new disposition hearing, where the court again found that a permanency plan of reunification was appropriate and in the best interests of the children. The court ordered CPS to continue to work with the parents toward reunification.

¶18. At the next hearing in February 2024, CPS reported that Callie and William continued to struggle financially, had barely visited or contacted the children since September, and had continued to display a lack of parenting skills during their rare visits with the children.

9

During the visits, Callie vaped in front of the children, allowed them to wander off, and did not clean them. The court also received a report from B.M.'s therapist indicating that B.M. was fit to return home under the condition that his "victims" were not in the home. The court found that a permanency plan of reunification was no longer appropriate and that CPS had made reasonable efforts over a reasonable period of time, but the parents had failed to substantially comply with their service plans. The court changed the permanency plans for S.A., S.C., S.M., and D.M. to termination of parental rights and adoption.

¶19. In March 2024, CPS filed a petition to terminate the parental rights of Callie and William to S.A., S.C., S.M., and D.M.[7] The petition alleged that (1) the children had been adjudicated as neglected children; (2) the children had been in CPS's custody for at least six months; (3) the court had conducted a permanency hearing and determined that CPS had made reasonable efforts toward reunification, but the parents had failed to substantially comply with their service plans; (4) terminating parental rights was in children's best interests; and (5) termination was justified on five distinct statutory grounds. *See* Miss. Code Ann. §§ 93-15-115, -119, & -121 (Rev. 2021).

¶20. In September 2024, the youth court held a hearing on CPS's petition. William executed a voluntary written release of his parental rights as to S.A., S.C., S.M., and D.M. CPS supervisor Rachel Hodnett testified that William told her he signed the release because he did not believe he could care for the children and realized it was in their best interests to

---

[7] B.M.'s CPS case was bifurcated from the younger four siblings.

remain with their foster families. The court appointed an attorney to represent Callie and continued the hearing on CPS's petition until October 28, 2024. During the hearing, several witnesses, including multiple CPS employees, GAL Clark, one of the children's therapists, and one of the foster parents, testified that termination of Callie's parental rights was in the children's best interests.

¶21. In November 2024, the youth court entered a judgment terminating Callie's and William's parental rights to S.A., S.C., S.M., and D.M. The court found by clear and convincing evidence that the children had been adjudicated as neglected; that they had been in CPS's custody for at least six months; that CPS had developed service plans for reunifying the children with their parents; that CPS had made reasonable efforts for a reasonable period of time to diligently assist the parents in complying with their plans; and that the parents had failed to substantially comply with the plans. *See* Miss. Code Ann. § 93-15-115. The court also found by clear and convincing evidence that reunification was no longer desirable and that termination of Callie's and William's parental rights was warranted on five statutory grounds: (1) that Callie and William engaged in conduct constituting abandonment or desertion; (2) that Callie and William were mentally, morally, or otherwise unfit to raise the children; (3) that Callie and William were unable or unwilling to provide reasonably necessary food, clothing, shelter, or medical care for the children; (4) that Callie and William failed to exercise reasonable visitation or communication with the children; and (5) that Callie and William's neglectful conduct had caused, at least in part, a substantial erosion of

11

their respective relationships with the children.  The court also found that termination of Callie's and William's parental rights was in the children's best interests.  Therefore, the court terminated Callie's and William's parental rights and ordered that custody of S.A., S.C., S.M., and D.M. would remain with CPS with authority to consent to adoption.  Callie filed a notice of appeal.  William did not appeal.

## ANALYSIS

¶22.  The youth court is authorized to terminate parental rights if the court finds by clear and convincing evidence that:

(a)     The child has been adjudicated abused or neglected;

(b)     The child has been in the custody and care of, or under the supervision of, [CPS] for at least six (6) months, and, in that time period, [CPS] has developed a service plan for the reunification of the parent and the child;

(c)     A permanency hearing, or a permanency review hearing, has been conducted . . . and the court has found that [CPS] . . . has made reasonable efforts over a reasonable period to diligently assist the parent in complying with the service plan but the parent has failed to substantially comply with the terms and conditions of the plan and that reunification with the abusive or neglectful parent is not in the best interests of the child; and

(d)     Termination of the parent's parental rights is appropriate because reunification between the parent and child is not desirable toward obtaining a satisfactory permanency outcome based on one or more of the grounds set out in Section 93-15-119 or 93-15-121.

Miss. Code Ann. § 93-15-115.

¶23.  On appeal, Callie argues that the trial court (1) "fail[ed] to ensure [Callie] received

12

effective assistance of counsel," (2) "abused its discretion by allowing misrepresented evidence and biased testimony," (3) "failed to properly consider the best interests of the children by disregarding evidence of [Callie's] efforts to secure necessary services for her special needs children," and (4) "failed to ensure procedural due process by allowing biased parties to participate in the proceedings and by failing to provide [Callie] with a fair and impartial hearing." In response, the State maintains that Callie has failed to comply with Rule 28 of the Mississippi Rules of Appellate Procedure because the issues she raised are not supported by legal authority and meaningful argument. *See* M.R.A.P. 28. Therefore, the State maintains that Callie's arguments are all procedurally barred. Procedural bar notwithstanding, the State also argues that substantial evidence supports the youth court's findings and decision.

¶24. In reviewing the youth court's findings, we keep in mind that "this Court's standard of review is limited" in youth court cases. *In re S.A.M.*, 826 So. 2d 1266, 1274 (¶17) (Miss. 2002). The youth court's "findings of fact will not be overturned where they are supported by substantial evidence in the record, unless manifestly wrong." *Id*. This Court "asks not how we would have decided the case ab initio but whether there be credible proof from which a rational trier of fact may have found [grounds for termination] by clear and convincing evidence." *S.N.C. v. J.R.D. Jr.*, 755 So. 2d 1077, 1080 (¶7) (Miss. 2000) (other brackets omitted). "Even if this Court disagreed with the lower court on the finding of fact and might have arrived at a different conclusion, we are still bound by the judge's findings

unless manifestly wrong." *S.F. v. Lamar Cnty. Dep't of Child Prot. Servs.*, 373 So. 3d 985, 987 (¶9) (Miss. 2023) (brackets and quotation marks omitted).

¶25.    Mississippi Rule of Appellate Procedure 28(a)(7) provides that the appellant's brief "shall contain the contentions of appellant with respect to the issues presented, and the reasons for those contentions, with citations to the authorities, statutes, and parts of the record relied on."  "Arguments that do not comply with the rule are procedurally barred." *Reading v. Reading*, 350 So. 3d 1195, 1199 (¶19) (Miss. Ct. App. 2022); *see also, e.g.*, *Home Solutions of Miss. LLC v. Ridge*, 301 So. 3d 670, 677 (¶25) (Miss. Ct. App. 2020) (holding that appellants waived their argument on appeal by failing to cite any relevant parts of the record), *cert. denied*, 302 So. 3d 647 (Miss. 2020); *Doss v. Claiborne Cnty. Bd. of Supervisors*, 230 So. 3d 1100, 1104 (¶10) (Miss. Ct. App. 2017) ("In the absence of meaningful argument and citation of authority, an appellate court generally will not consider an assignment of error. A cursory argument without further reason or explanation is inadequate." (citation, quotation marks, brackets, and ellipsis omitted)); *Concerned Citizens of Raven Wood Subdivision v. Pearl River County*, 172 So. 3d 1234, 1236 (¶10) (Miss. Ct. App. 2014) ("It is axiomatic that the trial court's judgment is presumed to be correct and that the appellant bears the burden of showing reversible error in the court below.").  On appeal, Callie fails to cite any parts of the record on which she relies or make any meaningful argument.  Therefore, her claims are procedurally barred.

¶26.    Procedural bar notwithstanding, the youth court did not err by terminating Callie's

14

parental rights as to S.A., S.C., S.M., and D.M. The youth court found that the requirements of section 93-15-115(a)-(d) were satisfied and that it was in the children's best interests to terminate Callie's parental rights. The court further found clear and convincing proof of five statutory grounds for termination listed in sections 93-15-119 and -121. "Although the statutes provide several different reasons for termination, *only one statutory ground is needed to justify termination of parental rights.*" *E.H. v. Lee Cnty. Dep't of Child Prot. Servs.*, 420 So. 3d 341, 351 (¶42) (Miss. Ct. App. 2025) (emphasis added); *accord Bullock v. Miss. Dep't of Child Prot. Servs.*, 343 So. 3d 1079, 1086 (¶22) (Miss. Ct. App. 2022); *W.A.S. v. A.L.G.*, 949 So. 2d 31, 35 (¶11) (Miss. 2007). Therefore, we will affirm the youth court's judgment if substantial evidence supports at least one ground found by the youth court.

¶27. The youth court found by clear and convincing evidence that Callie failed to provide for the children's care and medical and mental health needs, that she failed to provide a safe and sanitary home free from bugs and trash, and that she has failed to provide the children with a home safe from sexual abuse. Applying our deferential standard of review, there is sufficient evidence to support the youth court's finding that Callie is unable or unwilling to provide reasonably necessary food, clothing, shelter, or medical care for the children. Based on the evidence presented at trial, we certainly cannot say that the youth court's finding was manifestly wrong. Therefore, we are bound to affirm the judgment of the youth court terminating Callie's parental rights. Because there is sufficient evidence to support the youth court's decision on this ground, we need not address the youth court's findings regarding

15

other grounds. *E.H.*, 420 So. 3d at 351 (¶42) ("Although the statutes provide several different reasons for termination, only one statutory ground is needed to justify termination of parental rights.").

¶28.   We also note that although Callie asserts on appeal that the youth court failed to afford her due process and a fair hearing, the record does not support her assertions.  Rather, as set out at length above, Callie was afforded numerous opportunities during a three-year period to comply with her service plan and regain custody of her children.  Callie repeatedly failed to keep her children safe and provide proper care for her children, but the youth court gave her numerous "second chances."  In the end, the youth court afforded Callie a fair hearing on CPS's petition to terminate her parental rights and fairly considered the evidence.  The youth court's judgment terminating Callie's parental rights is supported by ample evidence and is in the children's best interests.  Therefore, the judgment of the youth court is **AFFIRMED**.

        **BARNES, C.J., CARLTON, P.J., McDONALD, LAWRENCE, McCARTY, EMFINGER, WEDDLE AND LASSITTER ST. PÉ, JJ., CONCUR. WESTBROOKS, J., CONCURS IN RESULT ONLY WITHOUT SEPARATE WRITTEN OPINION.**